# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

ISAIAH RODRIGUEZ,

        Plaintiff,

vs.                                No. CIV 00-0519 LCS/WWD

AMERICA ONLINE, INC.,

        Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** came before the Court on Defendant's Motion for Summary Judgment (Doc. 68), filed October 9, 2001. The United States Magistrate Judge, acting upon consent and designation pursuant 28 U.S.C. § 636(c), and having considered the briefs, submissions, relevant law, and being otherwise fully advised, finds that this Motion is well-taken in part and should be **GRANTED IN PART**.

## I.    Facts.

The following statement of facts is set forth in the light most favorable to Plaintiff, with all reasonable inferences from the record drawn in his favor. *See Clanton v. Cooper*, 129 F. 3d 1147, 1150 (10th Cir.1997). Plaintiff, an Hispanic male, began working as a Customer Care Consultant in Defendant's Albuquerque Call Center on August 11, 1997. (Mitchell Aff. ¶ 3, Def. Ex. 3.) Plaintiff's duties included answering telephone calls from customers, responding to questions, and providing customer service in the areas of billing and technical support. (Mitchell Aff. ¶ 4, Def. Ex. 3.)

The customer care consultant position required not only technical skills, but also performance in the areas of attendance and customer satisfaction. (Youngman-Owens Deposition at 155-157, Def. Ex. 10; Carter-Houston Deposition at 112-113, Def. Ex. 9.) "Customer satisfaction" was rated by

AOL members who completed surveys evaluating consultants in the areas of courtesy and knowledge. (Youngman-Owens Deposition at 160-161, Def. Ex. 10.)

On January 22, 1998, Plaintiff received a written warning for violating Defendant's policy by downloading a version of software that he was not allowed to access. (Performance Counseling/Action Form attached as Ex. 2 to Rodriguez Deposition, Def. Ex. 11.) On July 25, 1998, Plaintiff received a written warning for chronic tardiness or absenteeism. (Performance Counseling/Action Form attached as Ex. 3 to Rodriguez Deposition, Def. Ex. 12.)

Plaintiff was named Consultant of the Month for September 1998. (Rodriguez Aff., Pl. Ex. F.) Prior to November 1998, Plaintiff was asked to serve on prestigious committees that were primarily composed of management personnel. (Rodriguez Aff., Pl. Ex. F.) These committees were considered stepping stones to being promoted to management. (*Id.*)

In November 1998, Director of Human Resources David Robertson met with Plaintiff and the rest of his team. (Rodriguez Deposition at 68-69, Pl. Ex. D.) A member of Plaintiff's team had been chatting about a union in the team chat room, and that employee had resigned and went to work for Gateway. (*Id.*) At the meeting, questions were raised as to job security. (Rodriguez Deposition at 68-70, Pl. Ex. D.) The general consensus was that employees did not feel that they had job security. (*Id.*)

Subsequent to the meeting, Plaintiff sent a "sarcastic" e-mail to seven to ten co-workers complaining that new hires received 100 shares of stock as soon as their training was complete, but that existing employees had not received such generous treatment. (Rodriguez Deposition at 66, Pl. Ex. D.) On November 12, 1998, Robertson called Plaintiff into a meeting with Robertson, Service Delivery Manager Pat Devlin, and Human Resources Generalist Jennifer Padilla. (Rodriguez

Deposition at 73, Pl. Ex. D.) The purpose of the meeting was to discuss Plaintiff's e-mail regarding the stock award for new hires. (*Id.*) In late 1998, Robertson and Devlin were concerned about the possibility that the Albuquerque call center might unionize. (Devlin Deposition at 53, Pl. Ex. G; Robertson Deposition at 26, Pl. Ex. H.)

At the meeting, Robertson explained to Plaintiff the rationale behind the new employee stock grant and reminded Plaintiff that Plaintiff had been awarded 150 shares of stock. (Rodriguez Deposition at 73, Pl. Ex. D.) Robertson then stated that Dave Palmer, the General Manager of the Albuquerque Call Center, had told Robertson that Plaintiff was "like the César Chávez of the call center, and when [Plaintiff] get[s] upset, [he] rall[ies] the migrant workers." (Rodriguez Deposition at 74-78, Pl. Ex. D.) Robertson made a large sweeping gesture with his arms as he made this statement. (Rodriguez Deposition at 74; 78, Pl. Ex. D.) Devlin then told Plaintiff that "you're not acting like an employee who likes their job. If you don't want to work here, you don't have to. There's nothing keeping you here." (Rodriguez Deposition at 75, Pl. Ex. D.)

Plaintiff was intimidated and construed the reference to him as César Chávez was a racially derogatory remark because it was said in such a negative context. (Rodriguez Deposition at 78-80, Pl. Ex. D.) Robertson told Plaintiff that he was not being reprimanded for sending the e-mail, but that Plaintiff should bring any future complaints to management. (Rodriguez Deposition at 76, Pl. Ex. D.) Plaintiff felt that the meeting had a hostile tone overall. (Rodriguez Deposition at 82, Pl. Ex. D.)

On November 13, 1998, Plaintiff sent Robertson an e-mail summarizing the meeting of November 12, 1998, and stating that "aside from the racial comment regarding César Chávez, I felt it was a productive meeting all around." (Robertson Deposition at 106, Pl. Ex. H; E-mail of November 13, 1998 attached as Ex. 5 to Rodriguez Deposition, Def. Ex. 20.) Robertson never

commented on or apologized for the César Chávez remark. (Robertson Deposition at 107, Pl. Ex. H.)

On December 1, 1998, Plaintiff's performance review noted deficiencies in customers' perceptions of Plaintiff's knowledge and courteousness, but that Plaintiff was meeting or exceeding expectations in all other areas of his performance. (Pl. Ex. K.) Plaintiff was issued a Performance Improvement Plan to increase his scores in the areas of knowledge and courtesy. (Def. Ex. 13.)

On December 18, 1998, while Plaintiff was walking to the shared printer on the call floor, Brian Wallace, a coach of another team, addressed Plaintiff by saying "Hey, César." (Rodriguez Deposition at 89, Pl. Ex. D.) When Plaintiff asked why Wallace addressed him that way, Wallace told Plaintiff that he heard Palmer refer to Plaintiff that way. (Rodriguez Deposition at 89, Pl. Ex. D.) Plaintiff told Wallace that he had "better watch that racist mouth." (*Id.*) Wallace then told Plaintiff that he had a "big spic mouth and that if [Plaintiff] did not watch [his] big spic mouth [he] would end up on unemployment like the rest of [his] people." (*Id.*)

Plaintiff wrote a note dated December 18, 1998 stating that Wallace appeared intoxicated with blood shot eyes. (Note dated December 18, 1998 attached as Ex. 5 to Rodriguez Deposition, Def. Ex. 21.) On December 18, 1998, Wallace wrote a WebCISS contact memo that stated in part that "I informed him [Plaintiff] that it was a joke and not a reference to him being a spic or somthing [sic] he should take personally." (WebCISS Printout dated December 18, 1998 attached as Ex. 11 to Rodriguez Deposition, Def. Ex. 24.) Plaintiff testified that he did not report this incident to management because he felt intimidated by the Human Resources Department based on Robertson's César Chávez remark. (Rodriguez Deposition at 108.)

Defendant denies that the Wallace exchange occurred, and has submitted evidence that

Wallace was not in the call center on December 18, 1998. (Def. Ex. 23.) Defendant's evidence indicates that Plaintiff or his friends may have made the WebCISS entry using Wallace's password. (*Id*.)

After the December 18, 1998 Wallace incident, co-workers would jokingly refer to Plaintiff as "César." (Rodriguez Deposition at 122, Def. Ex. 1.) Plaintiff testified that he had developed a "thick enough skin" and ignored these incidents. (*Id*.) Plaintiff did not report these "César" remarks to management. (*Id*.) When Plaintiff asked his co-workers to stop calling him "César," they complied with his request. (Rodriguez Deposition at 123, Def. Ex. 1.) Aside from the Robertson remark, the Wallace incident, and the "César" comments, there were no other incidents of racial harassment. (Rodriguez Deposition at 123, Def. Ex. 1.) Plaintiff raised the Robertson and Wallace incidents in his first EEOC charge, but did not mention to "César" remarks by co-workers. (Def. Ex. 22.) Plaintiff filed a second EEOC charge in April 1999 alleging retaliation. (Def. Ex. 32.)

On January 3, 1999, DeLonna Youngman-Owens became Plaintiff's coach. (Rodriguez Aff. ¶ 8, Pl. Ex. F.) Plaintiff initially was a mentor on her team and handled irate calls. (Rodriguez Deposition at 109, Def. Ex. 1.) On January 8, 1999, Plaintiff filed a charge of racial discrimination against Defendant based on the Robertson comment and the Wallace incident. (EEOC Charge attached as Ex. 9 to Rodriguez Deposition, Def. Ex. 22.) On January 9, 1999, Plaintiff informed Youngman-Owens that he had filed a charge of discrimination with the EEOC. (Rodriguez Deposition at 109, Def. Ex. 1.)

After Plaintiff filed the EEOC charges, Plaintiff was no longer a mentor. (Rodriguez Deposition at 109, Def. Ex. 1.) In early January 1999, Youngman-Owens told Plaintiff that she was taking him off irate calls so that his statistics would improve. (Rodriguez Aff. ¶ 8, Pl. Ex. F.)

However, Plaintiff testified that his WebCISS records indicated that he had no recent scores. (Rodriguez Aff. ¶ 9, Pl. Ex. F; Rodriguez Deposition at 109, Def. Ex. 1.) Defendant could not generate valid statistics for which it could reprimand Plaintiff unless he was placed on regular calls. (Rodriguez Aff. ¶ 10, Pl. Ex. F.) Irate phone calls are typically handled by the most experienced and capable consultants and result in the consultant being assigned lower scores for knowledge and courteousness by customers. (Carter-Houston Deposition at 29-32, Pl. Ex. M.) Youngman-Owens testified that she only took Plaintiff off irate calls for a short period of time. (Youngman-Owens Deposition at 143, Def. Ex. 10.) Youngman-Owens had temporarily taken other workers of irate calls in order to improve their customer satisfaction scores. (*Id.*)

Plaintiff testified that Youngman-Owens asked Plaintiff to sit next to her at all times and would constantly monitor him. (Rodriguez Deposition at 131-133, Def. Ex. 1.) On January 12, 1999, Plaintiff was counseled by Devlin about a screen name (HackedInternal) that he had created. (E-mail of January 12, 1999 attached as Ex. 13 to Rodriguez Deposition, Def. Ex. 14.) Devlin informed Plaintiff that the name was unacceptable and something he should not have on his business account. (*Id.*) On January 20, 1999, Plaintiff sent an e-mail to Robertson complaining Youngman-Owens was retaliating against him for filing EEOC charges by taking him off irate calls. (Robertson Deposition at 125-126, Pl. Ex. H.)

On January 27, 1999, Rodriguez received a written warning for rudeness to Teri Shulman, an AOL member, and for failing to carry out a reasonable job request. (Performance Counseling/Action Form attached as Ex. 16 to Rodriguez Deposition, Def. Ex. 15.) Youngman-Owens had attempted to speak to Plaintiff about a complaint received from Ms. Shulman, but Plaintiff left and did not give a satisfactory response. (*Id.*) Plaintiff refused to sign the January 27, 1999

reprimand.  (*Id*.)

On February 23, 1999, Plaintiff was given a warning for chronic tardiness and absenteeism. (Performance Counseling/Action Form attached as Ex. 21 to Rodriguez Deposition, Def. Ex. 16.) In the "Employee's Comments" section, Plaintiff wrote that he was seeking professional counseling to deal with the mental hardship from his job due to retaliation and hostile work environment.  (*Id*.)

On March 2, 1999, Plaintiff received a "written warning" and "final notice" for chronic absenteeism.  (Performance Counseling/Action Form, Def. Ex 17.)  In the "Employee's Comments" section, Plaintiff wrote that his attendance issues were due to a hostile work environment and that he equated working at AOL as "similar to being a person of Israeli descent being a chimney sweep in a concentration camp."  (*Id*.)  Plaintiff further stated that he had much more severe attendance issues in the past, but was only being routinely written up in retaliation for filing charges with the EEOC. (*Id*.)

In June 1999, Youngman-Owens went out on sick leave for three or four weeks and Charles Dowdy became Plaintiff's coach. (Rodriguez Deposition at 133-134, Def. Ex. 1.) Robertson directed Charles Dowdy to record conversations with Plaintiff.  (Dowdy Aff., Pl. Ex. C.)  While Dowdy was his coach, Plaintiff received no writes ups and Dowdy did not constantly monitor Plaintiff. (Rodriguez Deposition at 133-134, Def. Ex. 1.)

Robert Carter-Houston became Plaintiff's coach on July 25, 1999.  (Rodriguez Aff., Pl. Ex. F.) Carter-Houston found Plaintiff to be a hard-working, talented, and courteous employee.  (Carter-Houston Deposition at 10, Pl. Ex. M .)  Carter-Houston believed that Plaintiff had the qualifications to be promoted to coach.  (Carter-Houston Deposition at 41, Pl. Ex. M.)

On July 30, 1999, after Plaintiff was off her team, Youngman-Owens gave Plaintiff a "final

notice" for failure to meet performance criteria in the areas of "knowledge" and "courtesy." (Performance Counseling/Action Form attached as Ex. 26 to Rodriguez Deposition, Def. Ex. 18; Youngman-Owens Deposition at 161-162, Def. Ex. 10.) Youngman-Owens testified that she issued the July 30, 1999 reprimand to Plaintiff after he had moved to Carter-Houston's team because she had been on sick leave and was catching up and wanted the issues to be addressed. (Youngman-Owens Deposition at 158, Def. Ex. 10.)

Carter-Houston was unaware of any other instance where a former coach wrote up an employee based on what the employee had done while on the former coach's team. (Carter-Houston Deposition at 19, Pl. Ex. M.) The July 30, 1999 reprimand led to a reduction in Plaintiff's stock grant. (Rodriguez Deposition at 134-136, Def. Ex. 1.) Carter-Houston testified that he would not have written Plaintiff up for corrective counseling based upon the six months of data on Plaintiff's job performance from January 17, 1999 through July 17, 1999. (Carter-Houston Deposition at 114-117, Ex. M.)

While Plaintiff was on Carter-Houston's team, Carter-Houston told Plaintiff that Carter-Houston had been instructed by Jennifer Padilla to reprimand Plaintiff for attendance issues. (Rodriguez Deposition at 137, Def. Ex. 1.) Instead, of writing him up, Carter-Houston gave Plaintiff a verbal warning and directed Plaintiff to "make sure" that he came to work during three weeks of tech training that his team was undergoing. (*Id*.)

After the tech training was complete, Plaintiff initially was assigned to outbound calls, but was then reassigned to inbound calls (Rodriguez Deposition at 142, Def. Ex. 1.) Carter-Houston explained to Plaintiff that Human Resources told Carter-Houston to put Plaintiff back on inbound phone calls so that statistics could be generated on Plaintiff. (Rodriguez Deposition at 143, Def. Ex.

1.)  Plaintiff viewed this action as retaliatory.  (*Id.*)

Based on the statistics generated from the inbound calls, Plaintiff was reprimanded by Drew Peterson when Plaintiff's statistics fell .4 of 1% below the target.  (Rodriguez Deposition at 146, Def. Ex. 1; Rodriguez Aff., Pl. Ex. F ¶ 12.)  Peterson told Plaintiff that Peterson had been instructed to write Plaintiff up.  (Rodriguez Deposition at 146, Def. Ex. 1.)  Plaintiff protested because some of the statistics had been generated when his team had been pulled out of training to handle a large volume of calls, and the team had been told that statistics did not matter during the high call volume period.  (Rodriguez Deposition at 147, Def. Ex. 1.)  Carter-Houston testified that Peterson had directed Carter-Houston to terminate Plaintiff, but that Carter-Houston protested and Plaintiff was reprimanded instead.  (Carter-Houston Deposition at 50-51, Pl. Ex. M.)

After Carter-Houston became a tech saves coach, Plaintiff was placed on John Lawrence's team.  (Rodriguez Deposition at 118, Def. Ex. 1.)  Lawrence constantly monitored Plaintiff.  (Rodriguez Deposition at 118, Def. Ex. 1.)  On November 13, 1999, Lawrence gave Plaintiff a written warning for attendance violations totaling 29.25 hours during the period October 3, 1999 to November 13, 1999, and for failing to meet performance standards.  (Performance Counseling /Action Form attached as Ex. 26 to Rodriguez Deposition, Def. Ex. 19.)  In the "Employee's Comments" section, Plaintiff wrote that his absences were due to stress created by his job and the hostile work environment, and that he was receiving professional therapy.  (*Id.*)  Plaintiff further stated that he believed the write ups were in retaliation for his EEOC filing.  (*Id.*)

Plaintiff testified that Lawrence reprimanded him for high idle and call time. (Rodriguez Deposition at 150, Def. Ex. 1.)  Plaintiff believed that the November 13, 1999 reprimand was retaliatory because all tech workers had high idle and call times because of a new software called

Sherlock that had a lot of bugs.  (Rodriguez Deposition at 151-152, Def. Ex. 1.)

On December 3, 1999, Plaintiff e-mailed his resignation letter to management and co-workers.

(Def. Ex. 2.)

Plaintiff's job application, signed on August 2, 1997, contained the following disclaimer:

> I understand that employment at AOL is on an "at will" basis and that my employment may be terminated with or without cause at any time, at my option, or that of AOL. I further understand that no AOL employee or representative has the authority to enter into a contract regarding the duration or terms and conditions of employment other than an officer or official of AOL and then only by means of a signed written document.

(Def. Ex. 4.)

On February 24, 1999, Plaintiff signed a "Confirmation of Receipt" acknowledging receipt

of a copy of the AOL Employee handbook.  (Def. Ex. 5.)  The Confirmation Receipt states:

> I understand that this Handbook does not constitute a contract of employment, that I have the right to terminate my employment at any time, and that America Online retains the same right regardless of any other document or oral or written statements issued by AOL or its representatives.

(Def. Ex. 5.)

The AOL Employee Handbook states in pertinent part:

> Employment with AOL is voluntarily entered into, and the employee is free to resign at will at any time, with or without cause.  Similarly, AOL may terminate the employment relationship at will at any time, with or without notice or cause, so long as there is no violation of applicable federal or state law.

(Def. Ex. 6.)

## II.  Procedural Background.

On April 12, 2000, Plaintiff filed his Complaint in this Court, alleging harassment, retaliation

and constructive discharge under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C.

§ 2000e (Count I), and supplemental state law claims for breach of implied employment contract (Count II), and intentional infliction of emotional distress (Count III).

On June 23, 2000, Defendant filed a Motion to Dismiss, arguing that the employee handbook negates the claim for breach of implied employment contract and that Plaintiff failed to allege sufficiently outrageous and extreme conduct and sufficiently severe injury to state a claim for intentional infliction of emotional distress. (Doc. 11.) On November 3, 2000, the parties fully consented to designation pursuant 28 U.S.C. § 636(c). (Doc. 18.) On November 17, 2000, I issued a Memorandum Opinion and Order denying the Motion to Dismiss. (Doc. 19.)

On October 9, 2001, Defendant filed its Motion for Summary Judgment, arguing that it did not engage in any severe or pervasive discriminatory or retaliatory conduct that resulted in tangible employment action affecting the terms and conditions of Plaintiff's employment, that Plaintiff was not constructively discharged, that Plaintiff was an at will employee and that there was no employment contract, and that Plaintiff cannot establish a claim for intentional infliction of emotional distress. (Doc. 68.)

## III.    Standard for Summary Judgment.

A motion for summary judgment may be granted only when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). Summary judgment is proper when the pleadings, depositions, answers to interrogatories and admissions on file, as well as any affidavits "show that there is no genuine issue as to any material fact." *Id.* When applying this standard, the Court examines the record and reasonable inferences in the light most favorable to the non-moving party. *See Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Serve.*, 165 F. 3d 1321, 1326 (10th Cir. 1999).

11

The movant bears the initial burden of establishing that no genuine issue exists as to any material fact. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (quoting *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 289 (1968)). The movant's initial burden may be discharged by showing there is an absence of evidence to support the non-moving party's case. *See Celotex v. Catrett*, 477 U.S. 317, 323 (1986). When the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by identifying "a lack of evidence for the non movant on an essential element of the non movant's claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F. 3d 644, 671 (10th Cir.1998). Once the movant meets its burden, the burden shifts to the non-moving party to demonstrate a genuine issue for trial on a material matter. *See McGarry v. Pitkin Co.*, 175 F. 3d 1193, 1201 (10th Cir. 1999).

If the moving party satisfies its initial burden, the party opposing the motion for summary judgment may not rest upon mere allegations or denials in the pleadings, but must set forth specific facts showing there is a genuine issue for trial as to a dispositive matter for which it carries the burden of proof. *See Simms,* 165 F. 3d at 1326. It is not sufficient "to simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co v. Zenith Radio Corp.*, 475 U.S. at 586. An issue of material fact is genuine if a reasonable jury could return a verdict for the party opposing the motion. *See Bullington v. United Air Lines*, Inc., 186 F. 3d 1301, 1313 (10th Cir.1999). The substantive law at issue determines which facts are material in a given case. *See Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary

judgment." *Id.*

**IV.     Analysis**

**A.     Whether Plaintiff can establish a hostile work environment based on national origin harassment.**

Title VII prohibits an employer from discriminating against any individual with respect to the compensation, terms, conditions, or privileges of employment on the basis of national origin. *See* 42 U.S.C. § 2000e-2(a)(1). In order to prevail on his hostile work environment claim, Plaintiff must establish that under the totality of the circumstances: (1) the harassment was pervasive or severe enough to alter the terms, conditions, or privilege of employment, and (2) the harassment was racial or stemmed from racial animus. *See Trujillo v. Univ. of Colorado Health Sciences Ctr.*, 157 F. 3d 1211, 1214 (10th Cir. 1998) (*citing Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 67 (1986)). The severity and pervasiveness analysis looks to all the circumstances including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993); *see also Lockard v. Pizza Hut, Inc.*, 162 F. 3d 1062 (10th Cir. 1998).

"For a hostile environment claim to survive a summary judgment motion, 'a plaintiff must show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.' " *Penry v. Fed. Home Loan Bank*, 155 F. 3d 1257, 1261 (10th Cir.1998) (*quoting Davis v. United States Postal Serv.*, 142 F. 3d 1334, 1341 (10th Cir.1998)). As the word "environment" suggests, incidents of discriminatory behavior should

not be examined in isolation.  *O'Shea v. Yellow Tech. Serv., Inc.*, 185 F. 3d 1093, 1097 (10th Cir. 1999).  Accordingly, facially neutral abusive conduct should be considered in evaluating whether Plaintiff was subjected to a pervasive or severe hostile work environment.  *Id.*

Plaintiff's hostile work environment claim is based on the following evidence.  On November 12, 1998, Robertson called Plaintiff into a meeting with Robertson, Devlin and Padilla to discuss Plaintiff's e-mail regarding the stock award for new hires.  (Rodriguez Deposition at 73, Pl. Ex. D.) During the meeting, Robertson stated that Palmer had told Robertson that Plaintiff was "like the César Chávez of the call center, and when [Plaintiff] get[s] upset, [he] rall[ies] the migrant workers." (Rodriguez Deposition at 74; 78, Pl. Ex. D.)  Devlin then told Plaintiff that "you're not acting like an employee who likes their job.  If you don't want to work here, you don't have to.  There's nothing keeping you here." (Rodriguez Deposition at 75, Pl. Ex. D.)  During this time period, Robertson and Devlin were concerned about the possibility that the Albuquerque call center might unionize.  (Devlin Deposition at 53, Pl. Ex. G; Robertson Deposition at 26, Pl. Ex. H.)  Plaintiff felt intimidated and believed that the reference to him as César Chávez was a racially derogatory remark because it was said in a negative context.  (Rodriguez Deposition at 78; 80, Pl. Ex. D.)

On November 13, 1998, Plaintiff sent Robertson an e-mail summarizing the meeting of November 12, 1998 and stating that "aside from the racial comment regarding César Chávez, I felt it was a productive meeting all around."  (Robertson Deposition at 106, Pl. Ex. H; E-mail of November 13, 1998 attached as Ex. 5 to Rodriguez Deposition, Def. Ex. 20.)  Robertson never commented on or apologized for the César Chávez remark. (Robertson Deposition at 107, Pl. Ex. H.)

On December 18, 1998, Wallace addressed Plaintiff by saying "Hey, César."  (Rodriguez

Deposition at 89, Pl. Ex. D.) When Plaintiff asked why Wallace addressed him that way, Wallace told

Plaintiff that he heard Palmer refer to Plaintiff that way. (Rodriguez Deposition at 89, Pl. Ex. D.)

Plaintiff told Wallace that he had "better watch that racist mouth." (*Id*.) Wallace then told Plaintiff

that Plaintiff that he had a "big spic mouth and that if [Plaintiff] did not watch [his] big spic mouth

[he] would end up on unemployment like the rest of [his] people." (*Id*.) On December 18, 1998,

Wallace wrote a WebCISS contact memo that stated in part that "I informed him [Plaintiff] that it was

a joke and not a reference to him being a spic or somthing [sic] he should take personally."

(WebCISS Printout dated December 18, 1998 attached as Ex. 11 to Rodriguez Deposition, Def. Ex.

24.)

After the December 18, 1998 Wallace incident, co-workers would jokingly refer to Plaintiff

as "César". (Rodriguez Deposition at 122, Def. Ex. 1.) Plaintiff had developed a "thick enough skin"

and ignored these incidents. (*Id*.) When Plaintiff asked co-workers to stop calling him "César," they

did. (Rodriguez Deposition at 123, Def. Ex. 1.) Aside from the Robertson remark, the Wallace

incident, and the "César" comments, there were no other incidents of racial harassment. (*Id*.)

Defendant denies that the Wallace exchange occurred, claiming that Wallace was not in the

call center on December 18, 1998. (Def.'s Mot. for Summ. J. at 9-10.) Defendant insinuates that

Plaintiff or his friends made the WebCISS entry using Wallace's password. (Def.'s Mot. for Summ.

J. at 9-10.) However, the Court will accept Plaintiff's testimony as true for the purposes of this

motion. While appears that Plaintiff failed to exhaust administrative remedies with respect to the co-

worker remarks, the Court will include them in the hostile work environment totality of the

circumstances analysis because they do affect the outcome.

Isolated instances of harassment, while inappropriate and boorish, do not constitute pervasive

conduct of sufficient severity to create a hostile work environment. *See Bolden v. PRC, Inc.*, 43 F.3d 545, 551 (10th Cir. 1994) (holding that two overtly racial comments and one arguably racial remark over the course of eight years did not constitute pervasive conduct). The pervasiveness and severity inquiry is not a "counting measure" but instead requires the trier of fact to engage in a broad contextual analysis of the totality of the circumstances. *See Smith v. Northwest Fin. Acceptance, Inc.*, 129 F. 3d 1408, 1415 (10th Cir. 1997). The Tenth Circuit has emphasized the need for the district court to examine the totality of the circumstances, including the context in which the alleged incidents occurred. *Penry*, 155 F. 3d at 1262.[1] The severity and pervasiveness inquiry is particularly unsuited for summary judgment because it is quintessentially a question of fact. *O'Shea v. Yellow Tech. Serv., Inc.*, 185 F. 3d at 1098. The case at bar, however, does present a factual scenario ripe for summary judgment considering the totality of the circumstances.

The record, when viewed in the light most favorable to Plaintiff for purposes of summary judgment, establishes only a few isolated incidents of racial harassment. Plaintiff failed to demonstrate how these isolated comments created an unreasonably abusive work environment, detrimentally affected his working conditions, or impacted his work performance. The totality of the circumstances surrounding the statements of Robertson, Wallace and the co-workers is insufficient to constitute a hostile work environment. *See Harris v. Forklift, Systems, Inc.*, 510 U.S. at 23; *O'Shea v. Yellow Tech. Serv., Inc.*, 185 F. 3d at 1097. Defendant is entitled to summary judgment

---

[1] After briefing of this Motion was complete, the Tenth Circuit issued *McCowan v. All Star Maintenance Inc.*, _____ F.3d _____, 2001 WL 1521314 (Nov. 30, 2001), and reversed the district court's grant of summary judgment in favor of defendants on a racial hostile work environment claim. *Id*. _____ F.3d at _____ 2001 WL 1521314, *3. The comments in *McCowan* were much more egregious and much more frequent than the isolated comments in the instant case. The evidence presented in the instant case is much more similar to the facts of *Bolden* than the facts of *McCowan.* Therefore, *McCowan* is distinguished from Plaintiff's case.

on Plaintiff's hostile work environment claim.

**1. Whether AOL can be held liable for the comments of Brian Wallace and the "César" remarks of his co-workers.**

In *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), the Court held:

> An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence . . . The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

Id. at 807; *see also Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765 (1998).

Defendant asserts that it is not liable for the comments of Wallace based on *Faragher* because Plaintiff failed to report the incident to management before going to the EEOC and because Plaintiff never reported the co-worker "César" remarks. As more fully discussed *supra*, it is not necessary to resolve this issue, because, even including the Wallace confrontation and the remarks of his co-workers, Plaintiff was not subjected to a hostile work environment based on the totality of the circumstances.

**B. Whether Plaintiff can establish a that he was subjected to unlawful retaliation.**

Title VII prohibits retaliation against employees for asserting their rights under Title VII, providing that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).

The burden-shifting approach of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973) applies to Plaintiff's Title VII retaliation claim. *See Pastran v. K-Mart Corp.*, 210 F. 3d 1201 1205 (10th Cir. 2000). Plaintiff bears the initial burden of establishing a prima facie case of retaliation. *Pastran*, 210 F. 3d at 1206. "If a prima facie case is established, the burden of production shifts, and the defendant must articulate a legitimate, non-discriminatory reason for the adverse action." *Purrington v. Univ. of Utah*, 996 F. 2d 1025, 1033 (10th Cir.1993). Once Defendant has articulated a non-discriminatory reason for the action, then the burden shifts back to Plaintiff to show that the asserted reason is pre-textual. *Pastran*, 210 F. 3d at 1206.

1.      **Whether Plaintiff can establish a prima facie case of retaliation.**

In order to establish a prima facie case of retaliation, Plaintiff must show that: (1) he engaged in protected opposition to discrimination; (2) he was subjected to adverse employment action by his employer; and (3) a causal connection exists between the protected activity and the adverse action. *See McCue v. Kansas Dep't of Human Resources*, 165 F. 3d 784, 789 (10th Cir.1999). The plaintiff bears the initial burden of establishing a prima facie case by a preponderance of the evidence. *Perry v. Woodward*, 199 F. 3d 1126, 1135 (10th Cir. 1999). Defendant admits that Plaintiff has satisfied the first element, but asserts that Plaintiff has failed to meet the second and third components of his prima facie retaliation case.

The second element of the prima facie case requires Plaintiff to establish that he was subjected to an adverse employment action. The Tenth Circuit liberally interprets the phrase "adverse employment action" and takes a case-by-case approach in determining whether a given employment action is 'adverse.' *Jeffries v. Kansas*, 147 F. 3d 1220, 1231-32 (10th Cir.1998). The threshold for showing adverse employment action is not high. For instance, in *Gunnell v. Utah Valley State*

*College*, 152 F. 3d 1253 (10th Cir. 1998), the Tenth Circuit found that co-worker hostility and

harassment, if sufficiently severe, qualified as an adverse employment action. *Id.* at 1264. Similarly,

in *Berry v. Stevinson Chevrolet*, 74 F. 3d 980 (10th Cir.1996), malicious prosecution qualified as an

adverse employment action. *Id.* at 986-87. In *Connor v. Schnuck Markets, Inc.*, 121 F. 3d 1390,

1395 (10th Cir. 1997), negative evaluations were sufficient to satisfy the second element of the prima

facie case. *Id.* at 1395. Plaintiff has come forward with sufficient evidence to satisfy the adverse

action prong of his prima facie case.

On January 8, 1999, Plaintiff filed a charge of racial discrimination against Defendant based

on the Robertson comment and the Wallace incident. (EEOC Charge attached as Ex. 9 to Rodriguez

Deposition, Def. Ex. 22.) On January 9, 1999, Plaintiff informed Youngman-Owens that he had filed

a charge of discrimination with the EEOC. (Comp. ¶ 40.)

After Plaintiff filed the EEOC charges, he was no longer a mentor. (Rodriguez Deposition

at 109, Def. Ex. 115.) In early January 1999, Youngman-Owens told Plaintiff that she was taking

him off irate calls so that his statistics would improve. (Rodriguez Aff. ¶ 8, Pl. Ex. F.) However,

Plaintiff testified that his WebCISS records indicated that he had no recent scores. (Rodriguez Aff.

¶ 9 , Pl. Ex. F; Rodriguez Deposition at 109, Def. Ex. 1.) Plaintiff testified that Youngman-Owens

asked Plaintiff to sit next to her at all times and would constantly monitor him. (Rodriguez

Deposition at 131-133, Def. Ex. 1.) On January 12, 1999, Plaintiff was counseled by Devlin about

the HackedInternal screen name. (E-mail of January 12, 1999 attached as Ex. 13 to Rodriguez

Deposition, Def. Ex. 14.)

On January 27, 1999, Rodriguez received a written warning for rudeness to an AOL member,

and for failing to carry out a reasonable job request. (Performance Counseling/Action Form attached

as Ex. 16 to Rodriguez Deposition, Def. Ex. 15.)  On February 23, 1999, Plaintiff was given a

warning for chronic tardiness and absenteeism. (Performance Counseling/Action Form attached as

Ex. 21 to Rodriguez Deposition, Def. Ex. 16.)  On March 2, 1999, Plaintiff received a "written

warning" and "final notice" for chronic absenteeism.  (Performance Counseling/Action Form, Def.

Ex 17.)   Robertson directed Charles Dowdy to record conversations with Plaintiff.  (Dowdy Aff.,

Pl. Ex. C.) Dowdy assumed that Defendant was watching Plaintiff to try to find grounds to terminate

Plaintiff. (*Id*.)

On July 30, 1999, after Plaintiff had left her team, Youngman-Owens gave Plaintiff a "final

notice" for failure to meet performance criteria in the areas of "knowledge" and "courtesy."

(Performance Counseling/Action Form attached as Ex. 26 to Rodriguez Deposition, Def. Ex. 18;

Youngman-Owens Deposition at 161-162, Def. Ex. 10.)  The July 30, 1999 write-up led to a

reduction in Plaintiff's stock grant. (Rodriguez Deposition at 134-136, Def. Ex. 1.)

Carter-Houston had been instructed by Padilla to reprimand Plaintiff for attendance issues.

(Rodriguez Deposition at 137, Def. Ex. 1.) Human Resources also told Carter-Houston to put

Plaintiff back on the inbound phone calls so that he could generate some statistics.  (Rodriguez

Deposition at 143, Def. Ex. 1.)  Based on the statistics generated from the inbound calls, Plaintiff was

reprimanded by Drew Peterson when Plaintiff's statistics fell .4 of 1% below the target for Tel Saves.

(Rodriguez Deposition at 146, Def. Ex. 1; Rodriguez Aff., Pl. Ex. F ¶ 12.)  Peterson told Plaintiff that

Peterson had been instructed to write Plaintiff up. (Rodriguez Deposition at 146, Def. Ex. 1.)

Lawrence constantly monitored Plaintiff.  (Rodriguez Deposition at 118, Def. Ex. 1.)  On November

13, 1999, Lawrence reprimanded Plaintiff for attendance violations and failing to meet performance

standards.  (Performance Counseling/Action Form attached as Ex. 26 to Rodriguez Deposition, Def.

Ex. 18 Ex. 27 to Rodriguez Deposition, Def. Ex. 19.)

On summary judgment, the Court must accept all well-supported factual allegations as true and construe them in the light most favorable to Plaintiff. The evidence establishes that Defendant reassigned Plaintiff's job duties, closely scrutinized his work, and frequently reprimanded him after he filed his charges with the EEOC. The written reprimands caused Plaintiff's stock options to be reduced. These factors qualify as adverse employment actions under Tenth Circuit authority.

In order to complete his prima facie case, Plaintiff must also demonstrate a causal connection between his charge of discrimination and the adverse action. The causal connection may be shown by producing evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action. *Bullington.*, 186 F. 3d at 1320. A retaliatory motive may be inferred when an adverse action closely follows protected activity. *See Chávez v. City of Arvada*, 88 F. 3d 861, 866 (10th Cir.1996). The closer in time that the adverse action occurred to the protected activity, the more likely it will support a showing of causation. *Compare Ramirez v. Oklahoma Dept. of Mental Health*, 41 F. 3d 584, 596 (10th Cir.1994) (one and one-half month period between protected activity and adverse action may, by itself, establish causation) *with Richmond v. ONEOK, Inc.*, 120 F. 3d 205, 208 (10th Cir. 1997) (three-month period, standing alone, is insufficient to establish causation).

On January 3, 1999, Youngman-Owens became Plaintiff's coach. (Rodriguez Aff. ¶ 8 , Pl. Ex. F.) Plaintiff initially was a mentor on her team and handled irate calls. (Rodriguez Deposition at 109, Def. Ex. 1.) On January 8, 1999, Plaintiff filed a charge of racial discrimination against Defendant based on the Robertson comment and the Wallace incident. (EEOC Charge attached as Ex. 9 to Rodriguez Deposition, Def. Ex. 22.) On January 9, 1999, Plaintiff informed Youngman-

Owens that he had filed a charge of discrimination with the EEOC. (Comp. ¶ 40.)

After Plaintiff filed the EEOC charges, he was no longer a mentor, and was taken off irate calls. (Rodriguez Deposition at 109, Def. Ex. 115; Rodriguez Aff. ¶ 8, Pl. Ex. F.) On January 12, 1999, Plaintiff was counseled by Devlin about a screen name that he had created. (E-mail of January 12, 1999 attached as Ex. 13 to Rodriguez Deposition, Def. Ex. 14.) On January 20, 1999, Plaintiff sent an e-mail to Robertson complaining Youngman-Owens was retaliating against him for filing EEOC charges by taking him off irate calls. (Robertson Deposition at 125-126, Pl. Ex. H.) On January 27, 1999, Rodriguez was reprimanded for the Shulman matter. On February 23, 1999, Plaintiff was given a warning for chronic tardiness and absenteeism. (Performance Counseling/Action Form attached as Ex. 21 to Rodriguez Deposition, Def. Ex. 16.)

During the one year and four months that Plaintiff worked for Defendant before he filed his first EEOC charge, Plaintiff only received two reprimands. Within days of filing the first EEOC charge, Plaintiff's job duties were altered, Plaintiff was subjected to close scrutiny, and the rate of his reprimands increased dramatically. Accepting all well-supported factual allegations as true and construing them in the light most favorable to Plaintiff leads to the conclusion that Plaintiff has established a causal connection between the protected conduct and the adverse action. Plaintiff has established a prima facie case of retaliation under Title VII.

**2. Whether Defendant had a legitimate, non-discriminatory business reasons for its treatment of Plaintiff.**

If a prima facie case is established, the burden of production shifts, and the defendant must articulate a legitimate, non-discriminatory reason for the adverse action." *Purrington*, 996 F. 2d at 1033. The Supreme Court has recently reiterated that "[t]his burden is one of production, not

persuasion ." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000). Once Plaintiff made a prima facie showing of retaliation, the burden shifted to Defendant to articulate a legitimate, non-discriminatory reason for its treatment of Plaintiff.

Defendant claims that Plaintiff was taken off of irate calls to improve his customer satisfaction scores and was reprimanded for failing to satisfactory respond to Youngman-Owens' inquires regarding the Shulman complaint. Defendant points out that Plaintiff was reprimanded because he had poor customer satisfaction scores and attendance violations, and that Youngman-Owens had good reason to closely monitor Plaintiff's performance given his poor ratings. Defendant has met its burden of production with respect to showing a non-discriminatory business reason for its actions. The burden now shifts back to Plaintiff to demonstrate pretext.

### 3. Whether Plaintiff has established pretext.

A plaintiff can show pretext by revealing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence." *Morgan v. Hilti, Inc.*, 108 F. 3d 1319, 1323 (10th Cir.1997) (quotations omitted). However, "mere conjecture that [the] employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment." *Branson v. Price River Coal Co.*, 853 F. 2d 768, 772 (10th Cir.1988). "[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves*, 530 U.S. at 148.

When assessing a contention of pretext, it is the manager's perception of the employee's performance, and not the employee's subjective evaluation of his performance, that is relevant.

*Shorter v. ICG Holdings, Inc.*, 188 F.3d 1204, 1209 (10th Cir.1999). The court may not second guess the business judgment of the employer. *Simms v. Oklahoma ex rel. Dept. of Mental Health & Substance Abuse Servs.*, 165 F. 3d 1321, 1330 (10th Cir. 1999). After viewing plaintiff's evidence as part of the record as a whole, if a rational juror could infer that the actions were of a retaliatory nature, then the plaintiff has established pretext. *Ortiz v. Norton*, 254 F. 3d 889, 898 (10th Cir. 2001).

Plaintiff has testified that there was insufficient data to score him in January 1999, and submitted evidence indicating that the Shulman complaint was trumped up. (Rodriguez Aff., Pl. Ex. F; Rodriguez Deposition at 197, Pl. Ex. D.) Carter-Houston and Dowdy have testified that they never observed Plaintiff being rude to a customer, and that he was one of the most technically knowledgeable consultants in the entire call center. (Carter-Houston Deposition at 11, Pl. Ex. M; Dowdy Aff., Pl. Ex. C.) Although Plaintiff had attendance and customer satisfaction issues before he filed his first EEOC charge, the rate and degree of discipline for the same behavior increased dramatically after January 8, 1999, the date Plaintiff filed his first EEOC charge.

"[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves*, 530 U.S. at 148. Plaintiff has produced evidence from which a reasonable fact finder could conclude that Defendant's reasons for monitoring and disciplining him were pretextual. Thus, Plaintiff has met his burden of demonstrating pretext. *See Reeves*, 530 U.S. at 148. Defendant's Motion for Summary Judgment should be denied with respect to Plaintiff's Title VII retaliation claim.

**C.      Whether Plaintiff can establish constructive discharge.**

Defendant argues that it is entitled to summary judgment on Plaintiff's constructive discharge claim because Plaintiff's working conditions were not intolerable.  In order to prevail on a constructive discharge claim, a plaintiff must demonstrate under an objective test that a reasonable person would have viewed her working conditions as intolerable.  *See Derr v. Gulf Oil Corp.*, 796 F. 2d 340, 343-44 (10th Cir. 1986).  A plaintiff's subjective view of the employment environment and the employer's subjective intent with regard to discharging him are both irrelevant.  *See id.*  If an employee resigns of his own free will, even as a result of the employer's actions, that employee will not be held to have been constructively discharged.  *See Yearous v. Niobrara County Mem'l Hosp.*, 128 F. 3d 1351, 1356 (10th Cir. 1997).  Essentially, a plaintiff must show that he had no other choice but to resign his employment.  *Id.* (*quoting Woodward v. City of Worland*, 977 F. 2d 1392, 1401 (10th Cir. 1992)).

A finding of constructive discharge must not be based only on the discriminatory act; there must also be aggravating factors that make staying on the job intolerable.  *See James v. Sears, Roebuck & Co., Inc.*, 21 F. 3d 989, 992 (10th Cir. 1994).  A constructive discharge occurs when an employer effectively prevents an employee from performing his job.  *See Sanchez v. Puerto Rico Oil Co.*, 37 F. 3d 712, 719 (1st Cir. 1994).  Actions such as demotions, offers of early retirement, reassignments to job with lower status or pay, depending upon the individual facts of the case, may constitute aggravating factors that would justify a finding of constructive discharge.  *See James*, 21 F. 3d at 993.

Plaintiff states that he was forced to resign because Youngman-Owens reprimanded him on July 30, 1999 for a period of time when she was not supervising him, Lawrence reprimanded him in

new areas on November 13, 1999, his eligibility for a promotion was delayed, and his stock options were reduced. (Pl.'s Response to Def.'s Mot. for Summ. J. at 33-34.) These factors, while unpleasant, are not sufficiently severe so as to make staying on the job intolerable. Moreover, Plaintiff resigned on December 3, 1999, almost three weeks after the last reprimand. Plaintiff's assertions in support of his claim of constructive discharge are insufficient to withstand summary judgment. Defendant should be granted summary judgment on Plaintiff's constructive discharge claim.

**D.     Whether Defendant's anti-discrimination policies created an implied employment contract.**

Defendant argues that Plaintiff's claim for breach of employment contract should be dismissed because Plaintiff was an at-will employee. New Mexico substantive law applies to this supplemental claim. *See BankOklahoma Mortgage Corp. v. Capital Title Co.,* 194 F. 3d 1089, 1103 (10th Cir. 1999). Under New Mexico law, an employer creates an implied contract of employment where its words and actions create a reasonable expectation of termination only for cause. *See Hartbarger v. Frank Paxton Co.*, 115 N.M. 665, 668, 857 P. 2d 776, 779 (1993). "An implied contract is created only where an employer creates a reasonable expectation. The reasonableness of expectations is measured by just how definite, specific, or explicit has been the representation or conduct relied upon." *Id.*, 115 N.M. at 672, 857 P. 2d at 783. Where a written personnel policy expressly reserves the right to terminate employment without notice for any reason, then the personnel policy, standing alone, does not give rise to an implied employment contract. *Garrity v. Overland Sheepskin Co.*, 121 N.M. 710, 714, 917 P. 2d 1382, 1385 (1996).

Defendant asserts that there was no implied employment contract because its job application

26

forma and employee handbook contained three disclaimers. Plaintiff's job application provided:

> I understand that employment at AOL is on an "at will" basis and that my employment may be terminated with or without cause at any time, at my option, or that of AOL. I further understand that no AOL employee or representative has the authority to enter into a contract regarding the duration or terms and conditions of employment other than an officer or official of AOL and then only by means of a signed written document.

(Def. Ex. 4.)

On February 24, 1999, Plaintiff signed a "Confirmation of Receipt" acknowledging receipt of a copy of the AOL Employee handbook. (Def. Ex. 5.) The Confirmation Receipt states:

> I understand that this Handbook does not constitute a contract of employment, that I have the right to terminate my employment at any time, and that America Online retains the same right regardless of any other document or oral or written statements issued by AOL or its representatives.

(Def. Ex. 5.)

The AOL Employee Handbook states in pertinent part:

> Employment with AOL is voluntarily entered into, and the employee is free to resign at will at any time, with or without cause. Similarly, AOL may terminate the employment relationship at will at any time, with or without notice or cause, so long as there is no violation of applicable federal or state law.

(Def. Ex. 6.)

These disclaimers clearly alerted Plaintiff to his at will status. Thus, Defendant's personnel policy standing alone, does not give rise to an implied employment contract. *Garrity v. Overland Sheepskin Co.*, 121 N.M. at 714, 917 P. 2d at 1385. In response to Defendant's argument, Plaintiff asserts that Defendant "impliedly abandoned" its written at will policy because its employees told Plaintiff he would not be disciplined for sending the sarcastic e-mail. (Pl.'s Response to Def.'s Mot. for Summ. J. at 36-37). Plaintiff does not cite to any support in the record for this assertion, but the

court will presume that Plaintiff is referring to the statements made at the November 12, 1998 meeting regarding the open door policy and the statements that Plaintiff was free to voice his opinion. These statements are insufficient to create a reasonable expectation that Plaintiff's at will status was modified. *See Hartbarger v. Frank Paxton Co.*, 115 N.M. at 668, 857 P. 2d at 779.

Plaintiff further argues, without any evidentiary support, that Defendant obligated itself not to retaliate against him for making a racial discrimination claim. (Pl.'s Response to Def.'s Mot. for Summ. J. at 37). Plaintiff appears to be referring to Defendant's anti-discrimination policy, contained in the personnel policy. Under *Garrity*, as discussed *supra*, the personnel policy cannot give rise to an employment contract because of the disclaimer. If Plaintiff was subjected to retaliation, he may obtain relief under Title VII. The record in this case does not support a separate cause of action for breach of implied employment contract under state law.

The totality of the circumstances surrounding the employment relationship must support a findings that the employer has made a promise that modifies an employee's at will status. *See Newberry v. Allied Stores*, 108 N.M. 424, 773 P.2d 1231,1234 (1989). After examining the record regarding the totality of the circumstances, and resolving all reasonable inferences in the light most favorable to Plaintiff, the Court finds that Plaintiff has failed to demonstrate a genuine issue for trial as to his claim for breach of implied employment contract. Therefore, Defendant is entitled to summary judgment on Plaintiff's breach of contract claim as contained in Count II

**E.     Whether Plaintiff can establish intentional infliction of emotional distress.**

Defendant argues that Plaintiff has failed to demonstrate conduct by Defendant sufficient to create liability under the tort of intentional infliction of emotional distress. New Mexico law applies to this supplemental claim. *See BankOklahoma Mortgage Corp. v. Capital Title Co.*, 194 F. 3d at

1103. Under New Mexico law, the Court must initially determine as a matter of law whether conduct reasonably may be regarded as so extreme and outrageous that it will permit recovery under the tort of intentional infliction of emotional distress. *See Trujillo v. Puro*, 101 N.M. 408, 414, 683 P.2d 963, 969 (Ct. App.1984).

Generally, in order to qualify under this standard, the recitation of the underlying facts to an average member of the community must arouse his resentment against the actor, and lead him to exclaim, "Outrageous!" *Padwa v. Hadley*, 127 N.M. 416, 419, 981 P.2d 1234, 1237 (1999) (*citing* Restatement (Second) of Torts § 46 cmt. d. (1965)). The conduct must be so extreme in degree as to go beyond all possible bounds of decency, and be regarded as atrocious, and utterly intolerable in a civilized community. *See Dominguez v. Stone*, 97 N.M. 211, 214, 638 P.2d 423, 426 (Ct. App. 1981). The mere fact that an actor knows that his conduct is insulting, or will deeply hurt another's feelings, is insufficient to establish liability under this theory. *See Padwa*, 127 N.M. at 419, 981 P. 2d at 1237.

The court in *Padwa* further explained that:

> By characterizing conduct as atrocious and utterly intolerable and beyond all possible bounds of decency, the Restatement sets the threshold at the very highest level for conduct to be considered actionable under the tort of outrage. It recognizes that, as part of the price of personal liberty, a free and democratic society must tolerate certain offensive conduct as well as some obnoxious or morally deviant behavior. Accordingly, the mere fact than an actor knows that his conduct is insulting, or will deeply hurt another's feelings is insufficient to establish liability . . . Accordingly, caution, therefore, is the watchword when examining whether the tort of intentional infliction of emotional distress encompasses the facts of a case.

*Padwa,* 127 N.M. at 420, 981 P. 2d at 1238.

The Court has accepted all well-supported factual allegations as true and construed them in

the light most favorable to Plaintiff.  The conduct of Defendant does not rise to the level necessary to permit recovery under the tort of intentional infliction of emotional distress.  During a November 12, 1998 meeting where Plaintiff was criticized by management, Robertson stated that Palmer had told Robertson that Plaintiff was "like the César Chávez of the call center, and when [Plaintiff] get[s] upset, [he] rall[ies] the migrant workers." (Rodriguez Deposition at 74-78, Pl. Ex. D.)

On December 18, 1998, Wallace addressed Plaintiff by saying "Hey, César."  (Rodriguez Deposition at 89, Pl. Ex. D.)  When Plaintiff asked why Wallace addressed him that way, Wallace told Plaintiff that he heard Palmer refer to Plaintiff that way.  (Rodriguez Deposition at 89, Pl. Ex. D.) Plaintiff told Wallace that he had "better watch that racist mouth." (*Id.*)  Wallace then told Plaintiff that he had a "big spic mouth and that if [Plaintiff] did not watch [his] big spic mouth [he] would end up on unemployment like the rest of [his] people." (*Id.*)  After the Wallace incident, co-workers would jokingly refer to Plaintiff as "César."  (Rodriguez Deposition at 122, Def. Ex. 1.)  When Plaintiff asked his co-workers to stop calling him "César," they complied with his request. (Rodriguez Deposition at 123, Def. Ex. 1.)  Aside from the Robertson remark, the Wallace incident, and the "César" comments, there were no other incidents of racial harassment.  (Rodriguez Deposition at 123, Def. Ex. 1.)

The record indicates that Plaintiff was subjected to retaliation.  After Plaintiff filed a charge of discrimination with the EEOC, his supervisor closely monitored him, he received multiple reprimands, and his stock award was reduced.

The racial remarks and the retaliatory treatment, even though callous and distasteful, are not so atrocious and utterly intolerable so as to progress beyond all possible bounds of decency so as to constitute intentional infliction of emotional distress under New Mexico law. *See Padwa,* 127 N.M.

at 420, 981 P. 2d at 1238. The distress suffered by Plaintiff in this case is no more severe than the distress suffered by many people who work in less than optimal conditions. As such, it is not actionable under New Mexico law as a claim for intentional infliction of emotional distress. *See id.* After examining the record and resolving all reasonable inferences in the light most favorable to Plaintiff, the Court finds that Plaintiff has failed to demonstrate a genuine issue for trial as to his claim for intentional infliction of emotional distress as raised in Count III. Therefore, Defendant is entitled to summary judgment on Count III.

## V. Conclusion.

Upon review of the evidence presented on this Motion for Summary Judgment, the Court has determined that Defendant's Motion for Summary Judgment (Doc. 68), filed on October 9, 2001, should be **GRANTED IN PART**. Defendant is entitled to summary judgment as to Counts II and III. Defendant is entitled to summary judgment Plaintiff's Title VII claims based on a hostile work environment and constructive discharge. Defendant's motion with respect to Plaintiff's Title VII retaliation claim should be **DENIED.**

**WHEREFORE,**

**IT IS ORDERED** that summary judgment shall issue in favor of Defendant as to Counts II and III and Plaintiff's Title VII claims based on a hostile work environment and constructive discharge.

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment with respect to Plaintiff's Title VII retaliation claim is hereby **DENIED.**

**A SUMMARY JUDGMENT CONSISTENT WITH THIS OPINION SHALL ISSUE.**

_____
**LESLIE C. SMITH**
**UNITED STATES MAGISTRATE JUDGE**